We're ready to hear our first case Connor versus Thompson. Mr. Ellis. Thank you your honor. May it please the court, my name is Nick Ellis and along with my partner Caroline Mackey and my colleagues Roger Askew and Jennifer Jones of the Wake County Attorney's Office, we represent the defendants in this case. Your honors, we are asking that the court reverse the district court which denied the defendant's motion for summary judgment. We ask that this court grant that motion principally based on qualified immunity. Your honors, in this case, factually what we are dealing with is... Counsel, you would agree, I take it that for purposes of our proceeding today, we are limited and bound by the extent they were determined by the district court. Judge, I think to the fact, to the conclusion that the cited facts by the district court, yes, the conclusions from those facts or the particularly the conclusion that they were disputed facts which justify the denial of the motion, no, obviously we don't believe that the court is bound by that. So any facts outside of what the district court found would not be open for us to consider, would not be disputed. No sir, I think that the court can consider the evidence that is in the record. Now we're going to principally talk about the facts that were cited in the district court's decision, but the again conclusion that the district court reached that there were disputed material facts that justified the finding of no constitutional violation and also no clearly established right, finding that there was a constitutional violation or an issue about it and that there was also an issue as to whether such right was clearly established. No, we believe that the facts that the court can consider are not disputed and considering those facts in the plaintiff that this court can find that the defendants are entitled to qualified immunity and that summary judgment was appropriate based on that defense. So as I understand the factual variance in this case, essentially the plaintiff's evidence is that the decedent was incapacitated whether by intoxication or emotional disturbance or some combination of both, had a knife in his hand, stumbling down some steps. The defendant's evidence is that the decedent was in an attack position with the knife and lunged at the police officer, but those are not facts established by the district court. And we're required to take the facts in the light most favorable to the plaintiff. Correct. Is that right? Yes, yes. So was the law clearly established if the decedent was at the foot of the steps simply holding the knife that the police officer was authorized to shoot him? Yes, sir. And the reason... Tell us your clearly established law. Why it's not. Why it's not clearly established. Can I pose one other question? Yes, sir. I noted in your brief a material fact you relied upon in your analysis was that the decedent was approximately 8 feet from the deputy sheriff. I can find that nowhere in the court's order. May I address that, Your Honor? Yes, sir. I know your expert says that, but that wasn't a finding by Judge Allard. No, sir, but the finding that I'm going to refer to, if I may, Your Honor, in the joint appendix. This is your expert's report. He made some measurements, right? No, sir. This is what I'm going to recite to Your Honor. It comes from the deposition of the homeowner, the uncle of the decedent, Todd McElfish. But that wasn't a factual finding by the district court judge. And that's what Judge Agy was asking about. Aren't we cabined to the district court's factual findings here? I don't believe that you are, Your Honor. And where we're talking about here is the fact that the decedent was in an attack position with the knife and lunged at the police officer, but those are not facts established by the district court. Can I pose one other question? Yes, sir. I noted in your brief a material fact you relied upon in your analysis was that the decedent was approximately 8 feet from the deputy sheriff. I can find that nowhere in the court's order. May I ask, based on what, do you not believe that we are cabined by the district court's factual findings? Your Honor, I think what we cited was in our brief that we're dealing with, essentially, a denote, wrote, and reviewed. And again, if you look at the district... Of the facts, has the district court found them? Your Honor, I don't think the finding that I want to respond to, to Judge Hudson's comment about the distance, is not a disputed fact and it is not a disputed fact pursuant to the district court. But the district court never made a finding, nor did that become a part of the court's analysis as articulated in his order? So isn't that outside the record for the purpose of our review? No, sir, I don't believe that you are solely, solely limited to the page and a half or so of the district court's findings. Then we have to make independent factual findings. Can a telecourt do that? Judge, when we're talking about the facts that are not in dispute, yes, I think the court can look at those facts and make the determination as to whether or not a constitutional violation has been shown and whether that violation was of a clearly established right. I imagine an opposing counsel will tell us their view of whether or not what you're going to recite to us in a moment is disputed or not. But you would agree, wouldn't you, that summary judgment at the appellate level, that we are in the fact-finding business, that we are without jurisdiction to your case? No, sir, Your Honor. And again, I think that what we are dealing with is- Well, tell us what law allows us at the appellate level to find facts in a summary judgment proceeding. Well, Judge, I think we're, and I'm perhaps missing the court's point or not articulating my response very well. What the facts are is found by the district court. Those facts the district court concluded created a dispute or made the conclusion that they were material. And what we are saying is let's look at those facts, look at them in the light most favorable to the plaintiff, see if there actually is a dispute, and see if they are material to the moment in time when force was used. Why don't you go ahead and cite what you wanted to in response to Judge Hudson's question about the distance. Yes, sir. In the Joint Appendix, page 618, and this is from the deposition of Mr. McElfrey, the question was on line 23, so you and Adam, Mr. Carter, are 2, 3, 4 feet apart from each other, correct? Answer, roughly, yeah, 4 feet or so, midway between both. Previously, he had testified on that same page of the Joint Appendix at line 1, question, and you were standing almost side by side. Answer, we would have been about, with the wall, it had to be 4 feet. So he has said, McElfrey, I'm standing and I've got the deputy 4 feet to my right, and I've got Mr. Carter 4 feet away from me. I am, his words, midway between both, 8 feet away. So that is not from an expert, that's not from some investigative report, that is from the homeowner, a fact witness that the plaintiff has proffered as part of the evidence to say that what they argue is a material fact, which is where was Deputy Thompson, and the key factor is how far was Deputy Thompson from Mr. Carter at the time that Deputy Thompson had to defend himself by using deadly force. And the evidence, it's not in dispute, it's from their own witness, is 8 feet apart. Well, wouldn't that go back to the basic finding by Judge Howard? Tell me if my take on the plaintiff's evidence is incorrect, because I understand that in a light most favorable to them, the decedent had descended the steps and was basically leaning against the wall, that's in a light most favorable to them. There are certainly other facts that your expert and others have put into the record, but if you find it in that circumstance, even if the officer is 8 feet away, if the decedent was just standing there holding a knife, what is unclear about the police officer's prohibition about shooting someone? Judge, I think you have to look at the facts that existed at the time that the force was used. You have Mr. Carter... And then what I just recited to you would be the facts. In all due respect, I disagree with that presentation. All right, well, tell us what they are. Yes, sir. We've got Mr. Carter, who was at the top of the steps. Uncle, Mr. McElfresh, comes into the house, goes up the steps, says, we've got a ride for you, we're going to get you some help. Starts to come down the steps. Hears the officer, the deputy say, drop the knife. No dispute about that. So that doesn't need to be viewed in light and favor of the plaintiff or of any party. It's a non-disputed fact. Drop the knife. Mr. Carter is halfway up the steps. That's not in dispute. He continues down the steps. That is not in dispute. Now whether he had a normal gait walking down the steps or whether he is looking for a handrail or whether he's impaired and leaning against the wall, he continues to come down the steps. So whether he is impaired or whether his gait is normal, I think in the Elliott case the court even cites somebody in an impaired, intoxicated condition is even more dangerous, even more of a threat to a law enforcement officer. In that case there was a specific threat against the officer in Elliott. And it was a gun that was pointed at the officer with his finger on the trigger. That's correct. So you're saying it is enough that he didn't drop the paring knife for the officer who is standing in front of an open doorway to just shoot him and kill him. Your Honor, what I'm saying is a law enforcement officer is confronted with a threat. And it's a knife. Whether it's a paring knife, whether it's a steak knife, whether it's a hunting knife, it's a knife. And the officer simply knows that it's a knife. He doesn't have the luxury of trying to determine exactly how sharp or dull the knife is. It's a knife and a knife is a deadly weapon or certainly a weapon. And that's the only thing you need based on your argument? Your Honor, no. Okay, then that's the only thing you have. That is not all we have, all due respect, Your Honor, because as the court knows, to use deadly force we have to have probable cause that there was a threat of serious physical injury to the officer or to others. In this case we have Mr. Carter coming down the steps in an impaired condition. It makes him more dangerous to the officer. He's coming down the steps. There is no dispute that he heard the warning, drop the weapon. There's no dispute that he heard the command, drop the weapon, which was given three times. In fact, Mr. Boykin and Mr. McElfish testify that after one of those, after the first command, go ahead and pull the trigger. So we've got a situation where you've got obviously a noncompliant Carter. He's got a weapon, a weapon that can, again, cause death or serious physical harm. He continues to come down the steps to approach the officer. So whatever distance is between those two, that distance is now shrinking. And now we are at the point where the second command is given. He continues down the steps. And the reason, Your Honor, that I disagreed with your earlier summarization of the facts, I think that the court concluded, or in its recitation, has Mr. Carter still on the steps. He got down off of the steps onto the floor. He is at the same level that Deputy Thompson is at. They are both on the floor. Mr. McElfish says they are eight feet apart. There is no case. And the deputy is at the front door, right? And the door is open if you take the facts as found by the district court? The deputy is in the entryway of the house. That's correct. And, Your Honor, to the— Well, isn't it disputed, though, what happened at the bottom of the steps as to whether or not the decedent was simply, for lack of a better word, hanging out at the bottom of the steps, leaning up against the wall, holding a knife in his hand, as opposed to evidence from the defendant that he was moving forward and had the knife up. If the trier of fact believes in a trial that the decedent was simply standing there at the bottom of the steps, holding the knife in a nonthreatening position, couldn't the jury return a verdict in favor of the plaintiff? Judge, we cited the case law that says when law enforcement gives command to an individual to drop a weapon, and it's a deadly weapon, and we are eight feet apart and there is a threat to the officer, the officer is authorized to use deadly force. Well, isn't that, though, a material disputed fact as to whether or not there is indeed a threat at that time if you take the evidence in the light that's available to the plaintiff? Your Honor, I don't agree that there is. We've got an individual, again, the facts we cited in our reply brief, it's about 11 points, I think, that talks about the situation where he's eight feet apart, he's been given multiple commands, he is threatening the officer, and of course we've got what is the objective reasonable officer going to do, but in all of those circumstances compiled together, in the totality of those circumstances, there has certainly not been any presentation of any case law that says that there is a right that Mr. Carter has clearly established that was violated when the officer defended himself when confronted by Mr. Carter with those circumstances. Your Honor, I believe we're out of time and we would like to... You've got some rebuttal time. Yes, thank you. Mr. Wills. Good afternoon, Your Honors. May it please the court. Again, my name is Hunt Willis. Together with my co-counsel, Ms. Christopher Olin, we represent the plaintiff in the appellee, the estate of Adam Carter in this matter. Your Honors, I would like to renew, if but just to not have waived it, our motion to dismiss this appeal. Prior to the briefing in this case, we did file a motion to dismiss appeal. The court is entertaining the motion today, or rather the hearing today, and we're prepared to proceed, of course, but we do want to renew that for a lot of the reasons that were just discussed. It is not always appropriate in a qualified immunity defense to act simply on the facts alleged from the district court or from the plaintiff or from the defendant, and it's easy to get lost in the case law when simply citing what to make that determination in. But in this case, we move to dismiss the appeal prior to any briefing because the district court made specific findings of fact that precluded the qualified immunity analysis under circumstances that are significantly material and of consequence to this case. So I think a lot of that discussion just took place, but we wanted to renew that motion. However, in any event and in any analysis under the qualified immunity defense that this appeal asserts, it is clear that Deputy Thompson violated Adam Carter's clearly established Fourth Amendment right when, in a matter of seconds to arriving at a home where no law had been broken, where no crime had been committed, he engaged his firearm and killed him. Now, as to the second point that we'll bring up later, but it's very important because these issues do cross, we have taken significant issue in our brief with the way in which the facts of this case have been characterized, and that also cuts towards what we were talking about with regard to the trial court's findings of fact. But it goes beyond that because to hear what I just heard, I have heard a case that beyond doubt shows that a deputy who was simply responding to a 911 call was attacked by a dangerous man with a knife and had no other option but to engage his firearm and kill the attacker. That is not this case, respectfully, Your Honor. That is certainly not this case. Well, it's not this case at this stage. If that's what the jury finds, then you have a very different case. But at the stage we're at, I think you would agree that the facts as found by the district court are what that's all we go by at the summary judgment stage. Indeed, Your Honor, we do. And we agree with that. And the district court was very specific in those facts. He highlighted three in the order. He said chief among the chief disagreements between the parties are. And he highlighted three very specific material facts that I have not seen in their brief, nor have I heard today, can be overcome. Now, as to the legal defense raised and the actual analysis should the court engage under the qualified immunity defense, interestingly enough, one of the most important cases from the Supreme Court, Graham v. Connor, that deals with these Section 1983 claims of excessive force wasn't even cited in their brief. Not once. The Supreme Court case that details the primary factors, and they've been called the Graham factors. In fact, recently, Judge Thacker published an opinion earlier this year that did an excellent analysis of the application of those Graham factors to a mentally estranged individual who's being engaged by the police. And it wasn't even cited in their brief. Now, the three Graham factors are important because that is what we use to determine whether or not the police's conduct was objectively reasonable. It certainly cannot simply be what Deputy Thompson's account of the incident is. If that were the case, it would be tantamount to requiring an officer to admit liability in all 1983 actions. So there has to be some objective analysis, and the Graham factors are how the court goes about in determining that analysis. Right off the bat, without discussing this case anymore, two of the three Graham factors aren't even met. The first one is, of course, what the severity of the crime being committed was to justify the use of force. No crime was being committed under anyone's interpretation of the facts in this case. The second Graham factor, the only one that perhaps could apply if you take Deputy Thompson's account of the circumstances as true, his subjective recalling of the account, is an immediate threat to the officer or others. Now, note it's not a threat, it's not a risk, it's an immediate threat to the officer or others. The third factor is actively resisting or evading arrest. The first and third factors have no application in this case. The only way we ever get to this analysis is if we determine that what Deputy Thompson encountered that day was an immediate threat to his safety or the safety of others. And the only way we get there is if we take the facts as they've construed it in their brief as true. And I've highlighted that a couple times because it is concerning to us that the way in which those facts have been characterized are not supported by the record. But in any event, take liberties with what actually happened and what Deputy Thompson was confronted with. Phrases like closing the distance on him, closing the gap, without any other context into the exclusion of all the actual evidence and testimony in the case makes it sound almost reasonable what they're arguing. But those simply aren't the facts of the case. The facts of the case are, and we've discussed them earlier and I don't want to go into too much detail, but the facts of the case are that no law enforcement was ever even contemplated to be involved in this situation until the family members had called this health facility and received no answer. It was only then that they contemplated calling EMS to provide Adam with transportation to the facility. So the very involvement of law enforcement in the case was not immediately contemplated. Adam Carter was coming down the steps, and we've talked about steps, and it's in the appendix, Your Honor. It's four carpeted steps. He was not quickly descending a large staircase. He was not rushing down towards the door. There are four steps that open up into a very large area. He was coming down those steps before Deputy Thompson came into the house. He was coming down the steps when Deputy Thompson came into the house. So to characterize his impending attack on Deputy Thompson as coming down the steps towards him is to the exclusion of any context. They have characterized Adam Carter's movement at the time as lunging toward him with a knife. The only evidence of that is Deputy Thompson's own account of this incident. The only evidence, two eyewitnesses, I think it was just conceded mere feet away from this incident, testified that no such behavior occurred in the district court. Frankly, noted that, and this experienced trial court judge considered all of that evidence very carefully when he determined that these are too material to engage in a qualified immunity analysis at this point. No threats of violence, no crime. The only evidence, unfortunately, and quite tragically in this case, was that Mr. Carter may have been a danger to himself. And in fact, this was characterized in the briefs and by the district court as a cry for help. That was the reason that 911 was called. That was the reason that Deputy Thompson arrived, was to help an unfortunately disturbed young man get to a facility. But the deputy didn't know that at the time. When he walked into the house, one thing he knew was that Burgess attempted suicide. A lot of the information about his background the deputy didn't know. Yes, Your Honor, that's correct. He did know that it involved a suicidal person, and although we submit that he could have known much more had he engaged in a reasonable evaluation of the circumstance in which he was being presented, that is what is clear, at least from the record, at a minimum of what he knew. Now, within a matter of seconds, Deputy Thompson engages his firearm, shoots and kills Adam Carter. That's not disputed, although Deputy Thompson's initial account of this incident, and quite frankly, his credibility is going to be an issue at the trial because he has not been consistent in his account of what happened that day. His first account of what happened when he was interviewed by SBI agents was that he was there from three to seven minutes. Now, when they're briefing to this court, it is a matter of seconds, perhaps under 40 seconds. And we know that's more likely than not how much time passed because we have the 911 call logs to show the time stamps. Well, that's a credibility finding, and that's not something that we did. Yes, Your Honor, true. But if the facts are characterized in such a way that Deputy Thompson's version of them is what must be dispositive, then we would submit that his version of those facts is not consistent. Now, I do want to address a couple of the cases because they have cited several cases. They've cited a lot of cases, but they've cited several cases by this court that presumably just answer the question about this qualified immunity defense. And probably the chief among those cases is Sigmund v. Chapel Hill. The problem with qualified immunity cases in this context, Your Honor, is that if we just pull quote citations from cases, we can probably justify any legal conclusion. We cannot engage in this analysis without context and without facts. Their use of the Chapel Hill case is a perfect example of that. In the Chapel Hill case, you have a thoughtful decision that used and applied all of the Graham factors in favor of a very reasonable police response that had the conclusion that it should have had. A gentleman in his house was threatening his domestic partner with her life. He had a very large butcher knife. Two police officers arrived. He attacked the police officers through the window when they arrived. He said things that the opinion states that I don't need to restate, but chief among them were threats of violence and death to both the police that had arrived that day and to his domestic partner. But strikingly in that case that they rely on so heavily, the police response actually cuts in favor of their use of it today. What did the police do? They stopped. The two police officers stopped. They backed up from the house. Four police officers then came. Multiple police officers came. They engaged in a dialogue. They attempted to de-escalate the situation, and it was only after that when this man came out with a knife running at one of the officers that they used deadly force. Now, I'm not trying to engage in any kind of hindsight with regard to the reflection of the facts in this case, but it is important to note that the chief case they cite was probably one of the most reasonable police responses that you could have asked for. Contrast that to this case. It was a mere escalation of force within seconds that Adam Carter was killed. Now, part of the facts that they point to, and they are facts in this case, that he was asked multiple times to drop the knife, and that's absolutely true. Deputy Thompson asked Mr. Carter to drop the knife. He did not comply with that request. Mr. McElfresh and Mr. Boykin, who were there, also asked him to drop the knife, but they asked him to drop the knife because they saw what was about to happen. They asked him to, and this is in Mr. Boykin's deposition as part of the record. He saw what was about to happen. Within a matter of seconds, this deputy had drawn his weapon and pointed it at Adam Carter, and yes, at that point, they pleaded with him to drop the weapon because they knew he was about to be shot and killed. And so that is a factual distinction that is certainly appropriate to some context, not just pleading to drop a weapon, failure to comply with the request, and being forced to engage with your sidearm. Very different. That's why the facts matter in this analysis. The other two cases that were cited that much attention was given to, Your Honor, was the Elliott case. I think that Judge Thacker's question essentially addressed the issue with them citing that case, which is first, there was a DWI arrest, so a crime had been committed. Second, this gentleman had been placed in the backseat of the cruiser and had somehow gotten his hands on a firearm that he pointed at two police officers through the window, mere feet away with his finger on the trigger. And using that case as a defense in this case is a good example of how you can get lost in the qualified immunity case law if you just cite propositions without facts. I refer to cases like that, and maybe this is not the best way to characterize them, but I refer to those kinds of cases as gun-grabbing cases, the kinds of cases where law enforcement officers, rightly so, are forced to decide within a few seconds, even sometimes wrongly, as some of the case law shows, but nevertheless forced to choose within seconds that an individual may be grabbing a firearm and using that against law enforcement. That is a very different type of case than a strange, distraught young man with a small paring knife across the hall who needs to be transported to a mental facility. It's just a different kind of case, and those officers that have to make those split-second decisions in all the cases that the courts have protected them in should have been protected and were protected, but this is not one of those cases. The last case that I do want to talk about before my time expires is important. We cited it to the court in a subsequent citation of authority because it was decided, I believe January 11th was the published date, but in Judge Thacker's opinion for the court, she highlighted the distinction between what an objectively reasonable law enforcement officer reacts to a person who is emotionally distraught versus any reaction in any case, and there is ample authority in that opinion that clearly addresses that a reasonable response to an emotionally distraught person is not the same response as a violent criminal like all of the cases that they've cited or someone who has a gun in a shopping mall like another case they've cited. In that case, Judge Thacker wrote, the individual was sitting on the ground holding on to a sign post and it wasn't armed. Everybody around them knew that this was a mental problem. I would submit that in a case like this, if we're this far apart and facts are that the individual is coming at the police officer with a knife in an attack position at this distance, it will be irrelevant whether they're a mentally disturbed or an escaped convict. I agree, Your Honor, in how you've characterized that. The only distinction that I would point out from that opinion is that, and it does bear relevance to this case, in law enforcement responses being determined objectively reasonable, that individual was not armed either, and I would concede that is also a distinction from that case. However, the important part of the holding is an escalation of force with an emotionally disturbed person is precisely the thing not to do when confronted with that situation. And this case that we're talking about today is a showcase example of that. The escalation of force is what led to Adam Carter's death. It was a palpable situation that the two gentlemen in the room described being anticipated happening by Deputy Thompson's escalation of force. And we don't mean, and I suppose the response will certainly be, this is engaging in 20-20 hindsight. We're trying to go back and say what he could have or should have done, but that's not what we're saying. What we're saying is, what is an objectively reasonable response? Is it pulling out your sidearm and engaging the individual, or is it de-escalating the situation? Engaging in at least more than a few seconds of dialogue, at least it has to be that. And the case law that they have cited that shows the police encounters with violent criminals, brandishing weapons and threatening to kill everyone around them, are not applicable. In conclusion, in terms of the case law, Your Honor, I believe that it's important, even though they're unpublished cases, that we draw some attention to the two that we cited in our brief, Pina v. Porter and Hathaway v. Ellerbush. We concede all of the points about them being unpublished and don't present them as binding authority to the court, but we would point out that the case law used in those decisions for the holding is very instructive of this case. In Pina v. Porter, they made the same arguments that the defendants are making in this case, which is essentially the mere presence of the weapon to the exclusion of all other evidence is sufficient to engage in lethal force. Court rejected that in that case, and in that case it was a firearm. It was a long rifle that the individual had, not a weapon or not a knife. In Hathaway v. Ellerbush, very strikingly similar circumstances. The lady who was killed in that case had scissors or shears or some sharp kind of knife-like object in her hand. The officer said she was closing in on him with those shears, and he engaged her with his firearm and killed her. And frankly, in that case, the facts were worse, because in that case the officer was warned before he went into the house that she was dangerous. In fact, he was there to interview her about a stabbing that occurred previously. So he had even more circumstances that cut against that particular use of force. So in conclusion, Your Honor, for all the reasons cited in our brief, this incident, this tragic incident, was an opportunity to answer Adam Carter's cry for help, and instead it was one that took his life. And we respectfully request that you affirm the trial court's denial of summary judgment. Thank you. Thank you, Mr. Willis. Mr. Ellis, you have some time in rebuttal. Thank you, Your Honor. Your Honor, the first point that I want to make is, obviously as we cited in our brief, unpublished cases cannot be the basis of clearly establishing a constitutional or statutory right. But I also want to talk about the Graham v. Conner points that were made, because those, contrary to counsel's argument, do not weigh in favor of the denial of the motion, but weigh in favor of granting the motion. First, look at the severity of the crime at issue. We agree the original call was a 9-1-1 call to assist somebody who was threatening suicide. It did not remain that way throughout our action between Mr. Carter and the deputy. He has a knife. He has the knife by his side. He is told to drop the knife. He refuses to drop the knife. He comes closer towards the deputy. The crime at issue is assault with a deadly weapon with intent to kill or inflict serious injury. This is not a stationary point in time. This is a fluid point in time. And those were the actions that caused the officer to have to do what he did. The second point, examine the extent to which the suspect poses an immediate threat. Again, it's undisputed. The plaintiff's own evidence says 8 feet apart, multiple commands to drop, refusal to command to drop, opportunity to drop from Mr. McElfresh, on the floor with the officer, he has no choice but to defend himself by using deadly force. Third, whether the suspect is actively resisting arrest or attempting to evade, he has been told to drop a weapon three times. I don't know what could be more actively resisting the officer than failing to discharge and dispose of a deadly weapon that Mr. Carter had. So what we're looking at again at the bottom line is in February of 2012. Was there a clearly established right for Mr. Carter to, with a knife, refuse to comply with orders from a law enforcement officer to drop it, to get closer to that officer, continuing to hold the knife with the blade exposed the entire time? Isn't that the controversy of the analysis? Isn't the question whether or not the officer was placed in reasonable fear, not necessarily whether the victim had a clearly established right to do something? He told us, did Carter have a clearly established right to do that? Correct. I think the controversy is the standard that we use for the analysis here. Well, Your Honor, what we're looking at is was there a constitutional right violated? That's the first element. Was there a right violated? If so, was that right clearly established? So I'm looking at it. Does he have a right to take a knife, refuse to drop it, get closer to the officer, and not have that officer have the ability to defend itself by using deadly force? And there is no such right that's been clearly established. So there has been no constitutional violation. Your Honor, we believe that all the evidence in the record clearly supports reversing the district court and granting summary judgment for the defendants. Thank you. Is there any other questions? Thank you very much. We'll come down and re-counsel and then go on to our next case.
judges: G. Steven Agee, Stephanie D. Thacker, Henry E. Hudson